United States District Court
Southern District of Texas
**ENTERED**
April 08, 2016
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff-Respondent, | § | |
| | § | |
| V. | § | CRIMINAL ACTION NO. H-10-193 |
| | § | CIVIL ACTION NO. H-15-2451 |
| BAO VAN HOANG, | § | |
| | § | |
| Defendant-Movant | § | |

## MEMORANDUM AND RECOMMENDATION

Before the Magistrate Judge in this federal habeas corpus proceeding pursuant to 28 U.S.C. § 2255 is Movant Bao Van Hoang's § 2255 Motion to Vacate, Set Aside or Correct Sentence (Document No. 74),[1] and Memorandum in Support (Document No. 75), the United States's Answer to Movant's § 2255 Motion and Motion for Summary Judgment (Document No. 81), and Movant's Response to the Government's Motion (Document No. 82). After reviewing the parties' submissions, the record of the proceedings before the District Court in the underlying criminal case, and the applicable case law, the Magistrate Judge RECOMMENDS, for the reasons set forth below, that the Government's Motion for Summary Judgment (Document No.81) be GRANTED, and that Movant Bao Van Hoang's § 2255 Motion (Document No. 74), be DENIED.

## I.    Procedural History

Movant Bao Van Hoang ("Hoang"), who is currently in the custody of the United States Bureau of Prisons, is seeking federal habeas corpus relief under 28 U.S.C.§ 2255. This is Hoang's

---

[1] Bao Van Hoang's Motion to Vacate, Set Aside or Correct Sentence can be found at Document No. 1 in Civil Action H-15-2451 and at Document No. 74 in Criminal Action No. H-10-193.

first attempt at § 2255 relief.

On March 31, 2010, Hoang was charged by Indictment with conspiracy to possess with intent to distribute a controlled substance in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A)(ii). (Document No. 1).  On September 7, 2012, Hoang pleaded guilty to the Indictment without a written plea agreement.  (Document No. 28).  The transcript of Hoang's Rearraignment shows that he understood the nature of the charges against him, the rights he would give up if he pleaded guilty, the possible penalties, and the sentencing process.  (Transcript of Rearraignment, Document No. 61, p. 4-11).  The record further reflects that the Government summarized what it was prepared to prove if the case proceeded to trial.  (Document No. 61, p. 11-16) The Prosecutor stated:

> If the case were to proceed to trial, the United States could prove each of the elements of the offense beyond a reasonable doubt.  The following facts, among others, would be offered to establish the defendant's guilt:
>
> On November 22nd of 2005, law enforcement officers, including special agents of the Immigration and Customs Enforcement and officers of the Houston Police Department and the Pasadena Police Department seized approximately 26 kilograms of cocaine and arrested four individuals from an apartment located on Hayes Road. Through this enforcement action, officers determined that persons residing at 7827 Cook Road, Houston, Texas, were involved in the illegal distribution of narcotics.
>
> On February 13, 2006, officers established surveillance on the Cook Road residence. During the surveillance officers observed a tan Ford Focus driven by an unknown Hispanic male arrive at the residence.  Special agents of the Immigration and Customs Enforcement saw the unidentified Hispanic male exit the Ford Focus, retrieve a black duffel bag and a money counting machine from the car's trunk and enter the Cook Road residence.
>
> Shortly thereafter, at approximately 4:55 p.m., an Asian male, subsequently identified as the defendant, Bao Van Hoang, was seen leaving the Cook Road residence carrying a black and gray duffel bag.  Hoang placed the duffel bag in the back of a GMC Yukon and left the residence.  Surveillance followed.
>
> Surveillance officers saw Hoang execute a series of counter-surveillance measures in an apparent effort to detect law enforcement, but officers were nonetheless able to follow Hoang to a residence located at 11712 Logan Ridge, Houston Texas.  Upon arriving, Hoang pulled into the driveway of the residence, backed out and then

parked the Yukon on the street.

Officers saw Hoang open the driver's door and the back door on the driver's side of the Yukon, but the officers' view of Hoang's movements were thereafter obstructed until Hoang left the residence.

While some surveillance officers remained at the residence, others followed Hoang away from the Logan Ridge residence and observed him commit a traffic violation at the intersection of Bellaire and Eldridge. A marked HPD patrol unit was contacted and a traffic stop was made by uniformed officers.

During the traffic stop, Hoang was identified and officers noted that the multi-colored, that is, black and gray duffel bag Hoang had been seen leaving–placing in the Yukon at the Cook Road residence was no longer in the Yukon. Hoang was released and surveillance units returned to the Logan Ridge residence.

At approximately 5:45 p.m., an unknown Asian male was seen exiting the Logan Ridge residence carrying a white plastic bag. The unknown Asian male entered a gold Honda and left the residence. HPD and Pasadena PD officers flagged down the unknown Asian male, who was later identified as Phong Phu Tran, and talked to the driver. Tran told the officers that the residence he had come from was not his but that he did have a key to secure it when he left. While Tran would not give officers consent to search the Logan Ridge residence, he did give consent, written consent to search his car.

In the car they retrieved a plastic bag from the front passenger seat and found it to contain several used latex gloves, two empty boxes of seal-a-meal bags ---

*                              *                              *

–and several used rolls of colored tape with the word "bedroom" imprinted on the tape. Tran told officers he placed these trash items in the bag while he had been at the Logan Ridge residence. Tran was also in possession of $5,581 in U.S. currency. A K-9 trained to detect the odor of narcotics alerted to the currency.

Officers noted that the used rolls of tape found in the bag were identical to the tape used to wrap the kilograms of cocaine officers had seized at the apartment on Hayes Street in November 2005. Tran was arrested.

Officers obtained a search warrant to search the Logan Ridge residence and executed that warrant on November 14th, 2006.

Using a key from a key ring obtained from Tran, officers entered the residence, observed it to be sparsely furnished, three-bedroom, single-story home. Officers found that the hardware to one of the bedroom doors had been replaced with a

deadbolt lock.  Officers used a key from Tran's ring which fit the deadbolt and opened the door.

In the bedroom closet, officers found two boxes containing 74-kilogram-size packages of cocaine, along with latex gloves, boxes of seal-a-meal bags, rolls of blue and yellow colored tape with the words "bedroom" or "kitchen" written along the tape.  Almost all of the kilogram-size packages were found to be wrapped in the distinctive colored and printed tape.  Also in the closet officers discovered the black and gray duffel bag Hoang had been seen carrying into the Cook residence.  The bag was found to contain cocaine residue.

A chemical analysis of the 74-kilogram-size packages seized from the Logan Ridge residence by a DEA forensic chemist were confirmed–the substance was confirmed to be cocaine with a net weight of 73.76 kilograms of 80 percent purity.

The residue from the black and gray duffel bag was found by the same DEA forensic chemist to be cocaine.

Several months later, on October 26, 2006, Hoang attempted to enter the United States from Canada with a fictitious Canadian passport.  Once in custody, Hoang was advised of his Miranda warning and after his waiving his rights in writing, spoke with the investigating agents.

During the interview Hoang admitted to buying kilogram quantities of cocaine in early 2006, which he delivered to the 11712 Logan Ridge residence.  He specifically admitted to having received 10 to 12 kilograms on February the 13th, 2006, from "Jose" at the Cook Road residence.  He admitt[ed] delivering this cocaine to the Logan Ridge residence where he had another 50 kilograms, approximately, stored. Hoang explained to agents that he rented the Logan Road residence as a stash house for narcotics and also counted the proceeds there.

Hoang also admitted that he began working for an Asian male named "J.B." as a courier of hydroponic marijuana sometime after 1999 until 2003 or 2004.  Thereafter he went into business for himself distributing hydroponic marijuana.  His source of supply was a Mexican–I'm sorry, a Vietnamese male known to him as "Big Bro" from Canada.  Hoang stated he got into smuggling cocaine in 2004 with the Mexicans.  His original source of supply was the Mexican male known to him as "Juan."  Hoang later obtained three to four shipments of 10 kilograms of cocaine each from another Hispanic male know to him as "Big Guy."  After "Big Guy" and his workers were arrested, Hoang found yet another Mexican source of supply.  From this source he purchased 3 to 10 kilograms of cocaine per transaction with an approximate total of 20 kilograms a month.  (Document No. 61, p. 11-16).

In response, Hoang confirmed the accuracy of the summary and his role in the offense.  (Document

No. 61, p. 16-17).

Prior to sentencing, a Pre-Sentence Investigation Report ("PSR") was prepared.  (Document No. 34, 35, 48), to which Hoang filed written objections (Document No. 46). [2]  With respect to the calculation of Hoang's offense level,  the PSR states in pertinent part:

Charges and Convictions

1.  On March 31, 2010, a one-count criminal Indictment was filed in the United States District Court for the Southern District of Texas, Houston Division, naming Bao Van Hoang, in Count 1, as the defendant.  Count 1 charges conspiracy to possess with intent to distribute 5 kilograms or more of cocaine, which occurred in February 2006.

2.  On September 7, 2012, Bao Van Hoang, along with counsel, appeared for a re-arraignment before the Honorable Melinda Harmon, United States District Judge, and pleaded guilty to Count 1 of the criminal Indictment.  There is no plea agreement. The defendant was remanded to custody pending sentencing.

3.  The defendant was previously sentenced on February 8, 2011, in the Eastern District of Wisconsin, in Docket Number 07CR304.  The defendant pleaded guilty to conspiracy to possess with intent to distribute 1,000 kilograms or more of marijuana.  The conduct related to the case was considered relevant conduct in the instant offense.  In the plea agreement for 07CR304, the defendant admitted he was involved in a drug trafficking conspiracy between 2004 and 2006, all of which is described in the offense conduct of the instant offense, and further agreed that the base offense level would be 38 based on the drug quantities for which the defendant was accountable under the provisions of 1B1.3, Relevant Conduct.  The defendant was ultimately sentenced to 102 months imprisonment, and 3 years supervised release.

The Offense Conduct

4.  Information for this section of the report was obtained through a review of the investigative files and/or of the United States Attorney's Office, Houston Police Department (HPD), Harris County Sheriff's Office (HCSO), Pasadena Police Department (PPD) and Department of Homeland Security-ICE and through direct contact with the Assistant United States Attorney.

---

[2] The record shows that Hoang filed written objections to the PSR.  Hoang objected to the three level upward adjustment based on this role in the offense.  Hoang argued he was an average participant and further argued that his role in the offense had already been decided by the United States District Court in the Eastern District of Wisconsin.

Synopsis

5.  The United States Immigration and Customs Enforcement (ICE), Office of the Special Agent in Charge (SAC) Houston, Texas, in conjunction with officers from the Houston Police Department (HPD), Pasadena Police Department (PPD) and the Harris County Sheriff's Office (HCSO), were conducting an investigation into importation of marijuana from Canada to the United States, along with the smuggling of cocaine from the United States into Canada, by an Asian organized crime syndicate.  Boa Van **Hoang** is believed to be the head of the organization and was directly involved with the related seizures and arrests at 2828 Hayes, Houston, Texas, on November 22, 2005.  A total of 605 pounds of marijuana, 20 kilograms of cocaine and 409 grams of Ecstasy were seized from this home.  Furthermore, **Hoang**, was directly associated with the seizure of 79.21 kilograms of cocaine at 11712 Logan Ridge, Houston, Texas.  Additionally, agents received information that a residence at 7827 Cook Rd. was being utilized for the distribution of drugs and for the storage of drug proceeds.

6.  On February 13, 2006, officers and agents established surveillance at 7827 Cook Rd., Houston, Texas.  Officers observed a tan Ford Focus driven by an unknown Hispanic male (UHM) arrive at the residence.  Agents observed the UHM exit the vehicle and retrieve a large black duffel bag and money counter from the trunk and enter the residence.

7.  A while later, agents observed an Asian male, later identified as Bao Van **Hoang**, exit the residence with a large multi colored duffel bag.  He placed it into the backseat of a GMC Yukon.  **Hoang** then departed the residence with surveillance units following.  Officers and agents observed **Hoang** make several heat runs in an attempt to detect law enforcement surveillance.  Officers and agents observed **Hoang** drive to a residence at 11712 Logan Ridge where he pulled into a driveway and then backed out and parked in the street.

8.  Officers momentarily lost site of **Hoang**, but they observed the driver's door and the back door on the driver's side, to be open.  They were unable to see what **Hoang** took from the vehicle.  **Hoang** then departed this location.  The officers maintained surveillance at 11712 Logan Ridge while other surveillance units followed **Hoang** away from the location.  Officers observed **Hoang** commit a traffic violation, and a Houston Police Department marked unit conducted a traffic stop on **Hoang**.  Upon stopping **Hoang**, officers observed that the duffel bag that the agent had observed being placed in the vehicle was no longer inside the vehicle.  **Hoang** was released and the surveillance units returned to 11712 Logan Ridge.

9.  Officers observed an unknown Asian male exit 11712 Logan Ridge carrying a white plastic bag.  The subject entered a gold Honda, and departed.  Officers flagged the subject down and approached the vehicle.  Officers identified the subject as Phong Phu Tran.  Tran stated that the residence he just came from was not his but he

did have a key to secure it when he left.  Tran stated that he would not give officers consent to search the residence but would consent to a search of his vehicle.  Officers obtained written consent for Tran's vehicle.  Agents retrieved a while plastic bag from the front passenger floorboard.  Upon opening the bag, the agent observed several used latex gloves, two empty boxes of seal-a-meal bags and several used rolls of colored tape with the word "bedroom" on it.  Tran advised the agent that he had placed the trash in the bag while inside of the residence.  Agents noted that the used rolls of tape were identical to the tape used to wrap the kilograms of cocaine seized from 2828 Hayes #418 on November 22, 2005.

10.  Tran was also found to be in possession of $5,581. A total of $5,000 was located in the front left pants pocket and $581 were in the rear left pocket.  A HPD Canine officer utilizing narcotics detector dog K-9 "Gale" determined evidence of the presence of narcotics on the currency.

11.  On February 14, 2006, officers obtained a search warrant for 11712 Logan Ridge.  On this same date, officers executed the warrant on the residence.  Upon opening a bedroom closet, officers discovered two boxes of what was later found to be 74 kilograms sized packages of cocaine along with latex gloves, boxes of seal-a-meal bags, and rolls of colored tape with the word 'bedroom" printed along the length of the tape, all identical to those seized from Tran's vehicle.  The kilogram-sized packages were found to be wrapped in the same color and pattern of tape that was discovered in the closet and the white bag that was discovered in Tran's vehicle.

12.  Also located in the closet where the cocaine was discovered, was the duffel bag that agents observed **Hoang** carrying out of the residence at 7827 Cook Road.  There was no other contraband discovered.  Upon terminating the search of the residence, agents seized the cocaine and currency.

13.  Tran was transported to the Houston Police Department and subsequently transferred to the United Stated Federal Detention Center by agents.

14.  Subsequent to the discovery of the cocaine at 11712 Logan Ridge, officers and agents decided to approach and attempt to secure consent to search the residence located at 7827 Cook Road.

15.  On February 14, 2006, agents and officers made contact with occupants of 7827 Cook Road.  Agents were able to obtain consent from Julio Uribe.  No illegal contraband was discovered, however, several firearms were confiscated.

**Arrest and Interview of Boa Van Hoang** (October 30, 2006)

16.  On October 30, 2006, agents arrested **Hoang** at the Rainbow Bridge Port of Entry (POE) in Niagara Falls, New York on a sealed warrant out of the Eastern District of Wisconsin (in Docket Number 05-00228-003, which was later dismissed

on December 7, 2006). **Hoang** had admitted to entering the United States at the POE on October 28, 2006 with a fictitious Canadian passport. Following his arrest **Hoang** was transported to the Buffalo Field Office. **Hoang** was advised of his Miranda warnings to which he acknowledged and agreed to speak with agents regarding his narcotic smuggling activities.

17. **Hoang** advised agents that after having worked in Huntsville, Texas, in 1999 at the Imperial Garden Restaurant, he came to Houston, Texas, and began working with an Asian male by the name of "J.B." **Hoang** advised that he was a narcotics courier for J.B. dealing in the transportation of marijuana, Ecstasy, and cocaine to customers that would purchase various narcotics. **Hoang** stated that he continued to work for J.B. until 2003 or 2004.

18. After that time, **Hoang** advised that he went into the narcotics business himself. He stated that he did not have money so the narcotics were "fronted" to him by his source of supply, "Bob," in Toronto, Canada. "Bob" was also known to **Hoang** as "Big Bro" (Vietnamese male). "Big Bro" supplied **Hoang** with marijuana, usually 200 to 250 pounds every two to three weeks. "Big Bro" would sell the "Hydro" marijuana to **Hoang** for $2,500 a pound and **Hoang** would then sell it out of Houston for $2,600 a pound. **Hoang** went on to advise that the shipments would come in from Canada to Houston on a semi-tractor trailers and would stop either at the "Flying J" truck stop on Interstate 45 north of Houston or the truck stop at Highway 59 by the Sam Houston Toll way.

19. Once the trucks arrived at either location, they would off-load the marijuana into vehicles of people that worked for **Hoang.** Hoang went on to advise that there were usually different trucks with various drivers. Once the trucks were close to arriving in Houston, Texas, the drivers would call **Hoang** and he would call his workers to pick up the narcotics.

20. **Hoang** stated he got into smuggling cocaine in 2004 with "the Mexicans." The unknown Hispanic male that had originally supplied him was known as "Jose." He got three to four shipments from another Hispanic male that he knew as "Big Guy" with each shipment being ten kilograms each time. "Big Guy" and his workers were later arrested.

21. An Asian male by the name of Toan Nguyen that **Hoang** had met in Houston, then set him up with some other Mexicans in order to supply him with cocaine. **Hoang** advised Toan Nguyen was the same individual who had been driving his vehicle in Wisconsin in 2005, when police conducted a traffic stop and discovered $250,000 concealed in the vehicle. **Hoang** went on to state the he would purchase three to ten kilograms per transactions and would pay $15,300 per kilograms. He would purchase an approximate total of "twenty kilos every month." Most of his cocaine was then being sold to "Big Bro" in Canada for $16,000 per kilo.

22.  **Hoang** provided details of three seizures as described below.

**Seizure at 2828 Hayes #418, Houston, Texas** (November 22, 2005)

23.  **Hoang** advised agents that he had a "stash house" at 2828 Hayes, Houston, Texas, that he used to store marijuana and cocaine.  He would also utilize the location to count the proceeds of their sale.  He stated that the apartment was in his brother-in-law's name, Thai Quoc Pham because **Hoang** had bad credit.  He went on to state that Thai Quoc Pham is married to his sister, Kelly **Hoang**, and that they reside at his parent's home. He added that Thai Pham did not know that the apartment was being utilized to conduct or support narcotics transactions.

24.  **Hoang** stated that the same UHM's that had attempted to drop off the kilos of cocaine and was arrested by police in November 2005, was the same person that Toan Nguyen had set him up with, in order to purchase cocaine.  These subjects would pick up money from the sale of the cocaine at 2828 Hayes.  They would drive into the attached garage of the residence, at which time **Hoang** would place a duffle bag containing money inside their vehicle.

25.  **Hoang** further added that the Ecstasy that was discovered by police at 2828 Hayes had been sent to him by "Big Bro" and was part of a total amount of 60,000 pills.  He stated that it had taken him approximately six months to sell the pills.  They were sold for $3.25 per pill while having been purchased for $2.75.  The left over pills had been damaged and were discovered by police (approximately 400 grams in powder form).

26.  After purchasing the kilos of cocaine from the Mexican source of supply, **Hoang** stated that he would then re-package the cocaine in tape from "U-haul" that was in different colors and had names across it such as "bedroom" and "kitchen."

27.  **Hoang** advised that following the arrest of Thanh Tran at 2828 Hayes, he had become scared and withdrew approximately $90,000 from his bank account at Metro Bank in Houston, Texas.  He took the money and went to Las Vegas, Nevada, and gambled.  He stated that he lost the majority of the money, which were drug profits, at various casinos.  After he returned to Houston, he stated that he contacted "Big Bro" in Canada and told him that he needed help in order to get back in the narcotics business. At that point "Big Bro" didn't send **Hoang** any product.  Instead, he sent him to Minneapolis, Minnesota, to meet with a black male by the name of "Sam." **Hoang** was instructed to pick up an unknown amount of currency from "Sam" and to then return to Houston.  **Hoang** advised that after doing so, he counted the currency, which was approximately $400,000.  The money was then stored in his bedroom at 8507 Jubilee Court in Houston, Texas.

**Seizure at 11712 Logan Ridge, Houston, Texas** (February 14, 2006).

28. "Big Bro" allowed **Hoang** to keep this money in order to purchase narcotics. He advised that he then rented the residence located at 11712 Logan Ridge, Houston, Texas. He stated that the owner of the residence was in California and that it was a verbal contract. After securing the residence, **Hoang** stated that Toan Nguyen placed him in contact with a Mexican by the name of "Jose" (Jose Cesar Uribe) who resided on Cook Rd., in Houston, Texas. "Jose" had brokered a deal for **Hoang** to purchase cocaine from another Mexican male.

29. **Hoang** stated that he had made several trips from his residence on Jubilee Court to the residence of "Jose,' purchasing the cocaine and then delivering it to 11712 Logan Ridge. He stated that Jose was driving a 2005 GMC Yukon. On one particular day (02/13/06) he was at "Jose's" residence on Cook Rd., when the above-mentioned Mexican male arrived. **Hoang** stated that Jose was a very large man and that he drove a gold colored four-door vehicle. Jose brought a large duffle black bag with him along with a money counter. **Hoang** brought approximately $150,000 to $200,000 in order to purchase ten to twelve kilos of cocaine from Jose. After Jose had counted the money he gave **Hoang** the cocaine. **Hoang** then departed the location and drove to 11712 Logan Ridge and then took it inside the residence where he then gave it to Phong Tran. After departing the residence, **Hoang** was stopped by police. Later that evening he discovered that Phong Tran had been arrested at 11712 Logan Ridge. He further stated that he thought there to be approximately fifty kilos of cocaine in the residence with twenty belonging to another Asian male by the name of "Wesley" who also worked for "Big Bro." All of the kilos that were inside the residence were supposed to be transported to "Big Bro" in Canada.

30. **Hoang** paid for Phong Tran's attorney, Ali Fazel. He had met him at Pappadeux's on Highway 290 and gave him $50,000 in cash that was in a paper bag.

31. Following the arrest of Phong Tran, **Hoang** removed his money from Metro Bank by conducting two wire transfers (transaction conducted on 02/17/06, which was discovered through a subpoena issued to Metro Bank regarding account #1171636). The money was wired to China and was then given back to **Hoang** by an Asian male in Houston. **Hoang** advised that he conducted the transaction in this matter to circumvent normal banking procedures and to avoid detection by law enforcement.

**Seizure of $254,280 by Racine County Sherrif's Department** (January 2005)

32. **Hoang** advised that in January of 2005, Toan Nguyen (driver identified as Toan Tran as mentioned above) had been driving his vehicle with Phong and the defendant when they were stopped by police in Wisconsin. **Hoang** stated that they had picked up the money, which were narcotic proceeds, in Chicago, Illinois, for an Asian male by the name "Tuan". When the money was being picked up in Chicago, **Hoang** stated he instructed the people on where to put it in the vehicle so it would not be discovered. **Hoang** advised that he was then supposed to pick up additional money

in Wisconsin and return to Houston. "Tuan" was supposed to pay **Hoang** two percent of the entire amount of currency that he was to pick up. **Hoang** advised that he was to be paid approximately $10,000. **Hoang** continued by stating that "Tuan's" boss is in Canada and that his name is "Tom" but that he never met him.

33. **Hoang** concluded by stating that he made approximately $500,000 conducting narcotics transactions, in the last two years (2004-2006). **Hoang** also stated that he was in the process of attempting to get back to Houston where "Big Bro" was to start shipping narcotics once again.

<u>Relevant Conduct Assessment</u>

34. The investigation of Boa Van **Hoang** began with information that officials received about importation of marijuana from Canada to the United States along with the smuggling of cocaine from the United States into Canada, by an Asian organized crime syndicate. **Hoang** is believed to be the head of the organization and was directly associated with several seizures in the Houston, Texas and in Racine County, Wisconsin. From November 2004 through February 2006, **Hoang** conspired with a number of people in the United States, Canada, and Mexico, to distribute cocaine, marijuana, and Ecstasy, and to collect drug debts for other, higher level distributors. During that two year time period, **Hoang**'s drug trafficking netted him approximately $500,000.00. The defendant was known as a Houston based distributor who regularly obtained hydroponic marijuana from "Big Brother," (B.B.) a supplier operating out of Toronto, Canada, who used semi-tractor-trailers to ship 200 to 250 pound quantities of marijuana to **Hoang** in Houston every two to three weeks. B.B. fronted the marijuana to **Hoang**, and charged him approximately $2,500 per pound. During the same period **Hoang** was obtaining marijuana from B.B., **Hoang** was also obtaining cocaine from a Mexican supplier. **Hoang** obtained approximately 20 kilograms each month and supplied most of it to B.B. Agents made significant seizures as part of this investigation. On November 22, 2005, law enforcement seized from one of **Hoang**'s stash houses, at 2828 Hayes #418 in Houston, Texas, 26 kilograms of cocaine, 700 pounds of marijuana, and 400 grams of Ecstasy (approximately 1,600 pills). In a post-arrest statement, **Hoang** stated the Ecstasy was the remainder of a 60,000 pill shipment he had gotten from B.B. On February 14, 2006, agents seized 70.62 (according to the lab report) from another **Hoang**'s stash house located at 11712 Logan Ridge in Houston, Texas. Agents noted that the used rolls of tape were identical to the tape used to wrap the kilograms of cocaine seized from 2828 Hayes #418 on November 22, 2005. **Hoang** had intended to ship all of that cocaine to B.B. in Toronto. Furthermore, at the time of the defendant's arrest on February 23, 2010, he was a passenger in a parked vehicle and was approached by a Houston Police officer. The officer subsequently located codeine on the driver and placed him under arrest. The officer ran a warrant check on the defendant and found him to have a marijuana warrant with the United States Marshal Service out of Milwaukee, Wisconsin and six city warrants with Houston, Texas. He was placed under arrest and transported to jail.

35.  As identified in the Offense Conduct section above, the defendant obtained 200 to 250 pounds of marijuana every two to three weeks between November 2004 and February 2006.  **Hoang** is also known to have obtained 20 kilograms of cocaine per month over the same approximately one year period.   These estimates are corroborated by a seizure of drugs from stash houses operated by **Hoang** on November 22, 2005 and February 14, 2006.  A conservative estimate of **Hoang**'s relevant conduct includes receiving and distributing approximately 200 pounds (91 kilograms) of marijuana per month for an approximate relevant conduct amount of 1,088 kilograms marijuana.  Based on a conservative estimate of 20 kilograms of cocaine per month for a term of one year, the resulting relevant conduct amount is 240 kilograms of cocaine.  The defendant is also responsible for an additional 400 grams of MDMA.  Pursuant to U.S.S.G. § 2D1.1, Application Note 8(B), when multiple substance are involved in the same offense, each substance is to be converted to it's marijuana equivalent and totaled for a combined offense level.  The 240 kilograms of cocaine is equivalent to 48,000 kilograms of marijuana and the 400 grams of MDMA is equivalent to 200 kilograms of marijuana.  The defendant will be held accountable for the equivalent of 49,288 kilograms of marijuana.

36.  It is noted this is a a conservative estimate of the drug trafficking activity for which the defendant is accountable and does not take into consideration the admitted drug trafficking conduct between 1999 and 2003 wherein the defendant advised that he was a narcotics courier for "J.B." dealing in the transportation of marijuana, Ecstasy, and cocaine to customers that would purchase various narcotics. (Document No. 34, pp. 3-9)(emphasis in original).

Hoang had a base offense level of 38 pursuant to U.S.S.G. § 2D1.1(c)(1).  Because Hoang was a manager or supervisor of a criminal activity that involved five or more participants or was otherwise extensive, his offense level was increased three levels under U.S.S.G § 3B1.1.  Because Hoang accepted responsibility and did so timely, his offense level was reduced by three levels under U.S.S.G. § 3E1.1. With an adjusted offense level of 38, and a criminal history category of I, Hoang had an advisory guideline sentencing range of 235 to 293 months.

At Hoang's May 17, 2013, sentencing hearing, Judge Harmon questioned Hoang about whether he had read over the PSR, whether he had discussed the PSR with counsel, whether he had any questions about the report, and whether he had any objections to the PSR that he would like to voice.  Hoang confirmed that he had read and discussed the PSR with counsel and had no objections

he wished to voice.  (Document No. 54, Transcript of Sentencing, p. 3-4).  The transcript of the

Sentencing hearing shows that counsel argued against the three level enhancement based on Hoang's

role in the offense, and that his sentence should be the same as that imposed in Wisconsin (102

months).  Based on counsel's calculations, Hoang should have a base offense level of 38, reduced

by three levels for acceptance of responsibility, and reduced by two points for safety valve.  With an

offense level of 33, counsel argued that Hoang had an advisory guideline sentencing range of 135

to 168 months.  Argument was also made concerning U.S.S.G. § 5G1.3(b) and the § 3553(a)

sentencing factors to take into account the 102 months' imprisonment imposed by the Court in

Wisconsin and for credit for time served after his arrest on February 23, 2010. .

> Mr. Mays:  One is we're objecting to Mr. Hoang being classified as a manager or a
> supervisor in the case.  It's an indictment where only one individual is charged.  It's
> not an indictment where a whole group of people are charged.
>
> In the Government's objection to his original classification as an average participant,
> the Government pointed out a number of things; but if you review what's contained
> in the addendum that was filed by probation in response to the Government's
> objection, the bulk of the factors that the addendum identified have to do more with
> the extensiveness or the size of the narcotic trafficking.
>
> And it focuses primarily on the fact that there was a lot of money involved, there
> were many kilos of cocaine involved, and there was a substantial amount of
> marijuana involved.  What it fails to do is identify any specific individuals that Mr.
> Hoang actually supervised or managed, and it fails to identify specific acts of
> supervision or management that he undertook.
>
> The two passing — the two passing glances that it takes in that direction are it says
> on one occasion that he paid attorney's fees for a co-Defendant, which I would
> submit to the Court could be construed as an act of management but also could be
> viewed as an act of a partner in a criminal enterprise, taking care of the partner who
> was arrested; and Mr. Hoang certainly would have expected that, had he been the
> person arrested, that the other individual would have paid his attorney's fees for him
> in an effort to help him out.  So, I would submit to the Court that that fact alone does
> not give rise to a finding that he was a manager or a supervisor in this conspiracy.
>
> The rest of the factors that are set out by probation are primarily just the
> extensiveness of the drug activity that he was involved in; and we are certainly not

here arguing that it was a minimal amount of narcotic trafficking, obviously.

The base offense level is 38, which is very high; and I would submit to the Court that the base offense level being at a 38 has taken into consideration and the sentencing guidelines have taken into consideration the extensive nature of the narcotic trafficking.

When the guidelines go up that high, the reason they go that high is because of the large quantity of drugs or the large amount of money that's involved.  And so, I would argue on Mr. Hoang's behalf that him being at a base offense level of 38 adequately considers the extensive nature of the drug conspiracy and that there are not facts sufficient to support a finding that he was a leader or organizer or a manager or a supervisor in this conspiracy, especially where it's a conspiracy where only one individual is charged.

And I certainly have had past experience when trying to argue that someone is a minor participant when they're in a one-person indictment with no success.  So, I would submit to the Court that, if you can't be a minor participant when you're the only person in your indictment, it's hard to be a manager or a supervisor when you're the only person in your indictment.

The other factor that I would submit with respect to that objection is Mr. Hoang's involvement in this case and his role in the cocaine trafficking has already been examined and ruled on by another district court judge in his companion case, if you will, that took place in Wisconsin.

All of the cocaine trafficking activities as well as the money that was involved and the marijuana were considered by that Court in that case, and he was found to be an average participant with respect to all of the same conduct that you're being asked to consider today.

And I would submit that it would be an inconsistent fact-finding for one judge to consider all those things and find him an average participant and another federal judge of equal authority to consider the same facts and circumstances and the same conduct and give him an aggravating role.  So, that's objection number one with respect to the manager/supervisor.

We also are arguing and we object to—we object to a sentence higher than what he's already received in Wisconsin, which was 102 months, and that is because I believe that–that sentencing him to more than what he's already been sentenced to with respect to the same conduct would violate his double jeopardy rights under the Fifthe Amendment.

And I apologize.  When I submitted my objection, I incorrectly identified it as a Sixth Amendment.  It is his Fifth Amendment right not to be tried twice for the same

offense.  So, I would amend my objection inasmuch as I cited the wrong amendment.

The Government's responded and cited a Supreme Court case from 1995, *United States v. Witte*.  In *United States v. Witte*, the question was if a person –if a judge had considered relevant conduct in another case–Mr. Witte had a marijuana case; and in that case, Judge Hoyt considered an extensive amount of cocaine trafficking activity as relevant conduct.

Mr. Witte was sentenced and then subsequently indicted for the cocaine trafficking activity that Judge Hoyt had considered as relevant conduct.  He filed a motion to dismiss the cocaine indictment citing that it would violate his double jeopardy rights.

And the Supreme Court said, "No, it does not violate your double jeopardy rights."  The distinction between *Witte* and Mr. Hoang's case is that, in Mr. Hoang's case, the cocaine trafficking activity considered by Wisconsin was not merely considered as relevant conduct.

The reason I attached the plea agreement that Mr. Hoang signed and entered into in Wisconsin to our objection is because it shows very clearly that the cocaine trafficking activity for which Mr. Hoang stands here today was considered not as relevant conduct but as the factual basis and is included in the factual basis of his plea agreement as the underlying support for his conviction in Wisconsin.

*Witte* focuses very specifically on the question of whether or not relevant conduct can subsequently be indicted and convicted for separately from however it's veiwed as relevant conduct.

I would submit to you that in Wisconsin the cocaine trafficking wasn't put in his presentence report, it was not included in his presentence report there as another offense or a relevant conduct offense, another offense that was uncharged that the court was aware of–which, if you read the opinion in *Witte*, they focused extensively on that question of relevant conduct as offenses outside of the one for which a person is convicted.

In Wisconsin the cocaine trafficking was considered part of that conspiracy and was considered, in fact, the factual basis for the drug conspiracy which he pled guilty to and was convicted there.

We considered, prior to pleading guilty to this offense, whether or not we should file a motion to dismiss based on double jeopardy. We did not do that simply because there is a time difference in the two indictments and they occur in different districts, and it may be that I should have pursued that more.

But I certainly would argue to the Court that, since that cocaine trafficking activity for which he stands here today and for which he plead guilty and has already been

considered in Wisconsin not only as relevant conduct but as the factual basis for the guilty plea up there in that conspiracy and as the factual basis that gave rise to his sentencing guideline calculations, that a sentence in this case exceeding what he received in that case would violate his double jeopardy rights and that it would punish him twice for the same offense which he has already been convicted of.

The Court:  Ms. Herrera.

Ms. Herrera:  Some interesting arguments.  And I will have to correct my response because I relied on your response regarding the Sixth Amendment.  However, I would point out to the Court since the Defendant has raised it, we totally disagree with the Defendant.

While we will agree that the Houston conduct was considered in the Eastern District of Wisconsin was considered by the Court, in his plea agreement on page 3, which it was submitted as an exhibit by the defense, page 3, the third full paragraph specifically describes the conduct for which he was charged and subsequently convicted in the Eastern District of Wisconsin, that is, that in January of 2005 he was sent by a Houston area distributor to collect drug debts in Chicago and Milwaukee. He didn't make those places  He got caught after they found $250,000 plus in his car. That was the basis of that indictment.

What is the rest of the indictment–I mean the rest of the information that's in the plea agreement comes from the Defendant's own statement which he made in October of 2006 when he illegally entered the United States or attempted to from Canada.

Now, he had fled to Canada to Houston following our case, the February, 2006, seizure of 75 kilograms — approximately 75 kilograms of cocaine at the Logan Ridge here in Houston which federal agents here then tied to a previous seizure in November 2005 because of the distinctive wrappings of the cocaine.

I don't want to get into an awful lot of facts. But the more significant portion of this is on page 6 of the exhibit.  Paragraph 15 specifically says:  The parties acknowledge, understand, and agree that, pursuant to the sentencing guidelines, Subsection –Section 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guideline range even if the relevant conduct is not the subject of the offense to which the Defendant is pleading guilty.

The fact remains that, while the Defendant may have known–clearly did know about what happened in Houston, his admitting it and Court considering it in the Eastern District of Wisconsin, as *Witte* suggests, is part and parcel of that judge's authority and responsibility in imposing an appropriate sentence.

It does not preclude and the Defendant has conceded that our case here in Houston is a different case:  different dates, different people, different locations.  And it is a

separate case.

There's nothing that precludes this district from charging him for the 74 kilos of cocaine that we found at the Logan Ridge residence nor the additional 24 kilos of cocaine we found in November along with the 700-plus pounds of marijuana.

What *Witte* stands for is beyond the – there is no double jeopardy. It also clearly explains–because in that case, too, the Defendant raised the concern that in his first prosecution he cooperated and his sentence imposed by the first district court included consideration of that departure.

But the Court makes it clear that the second prosecution–the judge in the second prosecution may consider all of that evidence in making their determination, is not bound– and I don't see any authority for one district court judge handling a separate matter, the findings of that judge binding this Court.

And I submit this Court is not bound by the findings in the Eastern District of Wisconsin. The Eastern District of Wisconsin looked at his conduct, all of it admittedly, but in deciding that judge then said he was a courier. It's referring to the offense conduct relating to that prosecution.

In this prosecution, the Government is looking at the events occurring in February of 2006 which we then tie to the November, 2005, seizure because of the similarity. There were people arrested at that time. And that's our case.

In between, this Defendant gave a confession, a post-Miranda confession, in which he admits to this Court–well, admits to law enforcement and which is provided to the defendant that he's been – he had been involved in drug trafficking since 1999, had gone out on his own two years before our event happened, that is, sometime in 2003 or 2004, and by that he was previously only dealing in marijuana. In 2004-2003, 2004, he began dealing cocaine in Houston; and he was receiving it here and distributing it to Canada, according to his own statement.

I'm not going to rehash everything, Judge, because it would take a long time. The Government has filed its response. We disagree with defense counsel. We believe there's more than sufficient evidence based on the quantity of the cocaine, the number of individuals found at the two different houses in November of 2005 and February 2006, as well as his own statement where he states: "I went out on my own. I would call my people to pick up the drugs. These were my two houses."

We saw him interacting with – and I believe at the time that he pled guilty, I went through a lengthy discussion about his Defendant having found multiple sources of cocaine because others are being arrested. So, he was in –he did–according to his own statement, he said he paid an attorney to represent the individual who was arrested at Logan Ridge in February of 2006.

We submit that the facts are more than sufficient to establish his role and that a three-point adjustment that's recommended by the probation department and is sought by the Government is appropriate in this case.

I think I've already covered–I think *Witte* specifically addresses the double jeopardy issue, the sentencing issue, and the proper application in a situation like this of the Sentencing Guidelines is to refer to Section 5G1.3; and we submit to the Court under the unusual circumstances of this case, it's Subsection C that applies because it was not the Eastern District of Wisconsin relevant conduct that increased the guidelines here but, rather, the other way around so–which is covered under Subsection B.

So, we would ask this Court to–that the proper–that the probation department has properly applied the guidelines based on the conduct in this case arising out of the conspiracy to possess with intent to distribute more than five kilograms of cocaine and had correctly calculated his role adjustment and –upward adjustments and downward adjustments; and we'd ask this Court to apply 5G1.3, Subsection C.

And the recommendation of the United States is that, in fashioning that sentence, the Court should adopt the PSR and its addendums; find that his punishment range is appropriate, 235 to whatever the range was, as the Government put in its response; and would recommend a sentence of 235 months to run concurrent with the 102 sentence that –month sentence that was imposed in the Eastern District of Wisconsin and further that he receive credit for the time served beginning from the date of his arrest on the Eastern District of Wisconsin's arrest warrant, which is February 23rd of 2010.

The Court:  Anything more on these objections?

Mr. Mays:  Your Honor, with respect to–just to complete my objection with respect to the manager or supervisor, we would argue that, as he was an average participant, he should not receive the three-level enhancement; and in addition to that, he has otherwise complied with all of the other requirements of the safety valve provision and has debriefed properly with the Government.

There was no firearm involved.  No one was injured.  He has no criminal history points and would, otherwise, be entitled to the safety valve.  So, I left that out the first time when I was addressing the manager/supervisor.

I would submit and argue that his total offense level should be a base offense level of 38, three points off for acceptance of responsibility, and two points off for safety valve, which would bring him to a Level 33 with an advisory guideline range of 135 to 168 months, I believe.

Ms. Herrera:  Your Honor, may I respond for just a second?

The Court:  Yes, you may.

Ms. Herrera:  I need to point out, given defense counsel's comment, the conviction in the Eastern District of Wisconsin was not counted for purposes of criminal history points in this jurisdiction because it was included, instead, as relevant conduct.

I will point out that, while the PSR talks about his relevant conduct that underlies–the conduct that underlies the indictment out of the Eastern District of Wisconsin, if the Court looks at the calculations made by the probation department, they did not attribute any specific amount based on the money.

So, while it is there and it's for this Court's consideration, it does not increase the guideline range.  I made that point only to make it clear that, if in fact, it had been counted as a criminal history point, because it's a felony, it might well have precluded a safety valve qualification in this district on these charges.

Mr. Mays:  As it's a conviction that occurred after the offense–the Wisconsin conviction occurred after the offense did.  So, I don't think they could include it on the guideline provision for--

Ms. Herrera:  I just want to make sure that the record is covered that I'm not exactly sure how it would apply.  I just know that it is not being considered for purposes of criminal history here but, rather, relevant conduct.

The Court:  Okay. I agree with probation, I agree with Ms. Herrera's argument.  I'm going to overrule your objections to the presentence report.  And I adopt the presentence report as my own, both the findings of fact, the application of the guidelines to the facts, and find a total offense level of 38, a criminal history category of I, which gives a guideline provision range of 235 to 293 months.

All right, anything else?

Mr. Mays:  Your Honor, we ask the Court to consider a variance under Section 3553(a).  Mr. Hoang is a perron who, obviously, was engaged in a large scale narcotic trafficking conspiracy; however, as the presentence report points out, he has absolutely no prior criminal history whatsoever.

He was not involved in any act of violence, no possession of any firearm, no one was hurt or physically injured as a result of his offense; and in this particular instance, a guideline range of almost 20 years, I would submit, does not comply with the requirements of 18, USC, Section 3553(a) in that it is much more incarceration than is necessary to meet the factors set out with respect to promoting respect for law enforcement, deterring Mr. Hoang and others from committing an offense like this.

And when considering him as an individual and considering this is the first time he's

ever been locked up for anything now going back to 2010, a sentence of 20 years is greater than necessary to meet the requirements set out under Section 3553(a).

And I would also point out the fact that he has pled guilty to these–to this offense twice; and as the Government pointed out, when he was arrested in New York, he immediately agreed to give a full confession about his involvement; and a large part of what's contained in the addendums to the presentence report is based on Mr. Hoang's statement and confession and his admission that he made without counsel and without the protection that would have been afforded to him had he had an attorney to request a proffer letter.

And so, as a result of his willingness to tell the truth, he is now being subjected to, I would argue, a harsher punishment as a result of that truthfulness. And certainly, we want to encourage individuals to tell the truth and to be honest when confronted by law enforcement about that they've done and not–not instead teach them that by doing so they incur a more significant sentence or greater penalties.

The Court: Anything else you would like to say, Ms. Herrera?

                    *                    *                    *

Ms. Herrera:  I'm going to rely on the Government's pleadings, the objections filed in this case.  I will point out to this Court, though, one important factor:  In November of 2005 when the seizure was made here in Houston, the Defendant in his own statement admitted he fled after the arrests were made of the people in the house–in the stash house that he obtained.

In February of 2006 when the arrest was made of the individual in the Logan Ridge house that he had obtained where he stored his coke–his cocaine, he again fled. When he came into the country in October of 2006, nine months after the Houston indictment incident, he was coming in from – from Canada.  He was coming in with false documents and a false passport, and he was stopped.

He gave a full confession, and he worked out a deal with the Government where the Eastern District of Wisconsin agreed to drop its original 2005 indictment to allow him to return to Houston to cooperate with law enforcement.  They dismissed it.  He comes back to Houston; and for some reason or another, he fled again.

Three years later, he's finally arrested again because, once he fled from Houston, the Eastern District of Wisconsin reindicted in 2007.  For a period of approximately three years, he was on the run.

When he was arrested finally in February of 2010, he was arrested in the company of a gentleman who was in the car who was using drugs.  It prompted a traffic stop. He was arrested because he had outstanding warrants, I think.  They were traffic

warrants.  And he was arrested on the outstanding warrant out of the Eastern District of Wisconsin.

We submit to the Court that the sentence recommended by the United States does fully address all of the factors under 3553 and that a variance is not warranted.  If this Court were to accept its recommendation of 235 months to run concurrent with the 102 months handed down in the Eastern District of Wisconsin with credit for time served, we think that is a reasonable sentence under the circumstances and fully addresses the 3553(a) factors.

The Court:  You say with credit for time served after February 23, 2010?  Is that what you're saying?

Ms. Herrera:  2010, yes, your Honor.  He was arrested on the Eastern District–he was arrested in Houston on the Eastern District of Wisconsin warrant on February 23rd of 2010.

The Court:  Okay.

Ms. Herrera:  So, I'm not certain how much credit this Defendant might receive from the Bureau of Prisons regarding the time he was in custody under their warrant.

The Court:  Their warrant, uh-huh.

Ms. Herrera:  And I want to make sure that that's considered.  (Document No. 54, pp. 4-20).

Hoang was sentenced to a total term of imprisonment of 225 months, to be served concurrently with the undischarged term of imprisonment imposed by the Eastern District of Wisconsin in case number 07-3041, to be followed by a five year term of supervised release, to run concurrently with his supervised release term imposed in Wisconsin, and a a fine of $100.  (Document No. 54, pp. 24-26).

In imposing a 225-month sentence, Judge Harmon stated:

Bao Van Hoang is before the Court for the offense of conspiracy to possess with intent to distribute five kilograms or more of cocaine.  As part of the continuing investigation into the drug trafficking/money laundering activities of a Mexican drug trafficking organization operating in the Houston, Texas, area, officer of the Houston Police Department Narcotics Division along with the agents of the United States Immigration and Customs Enforcement and officers of the Pasadena Police Department initiated surveillance at several stash houses in the Houston, Texas, area.

As a result of the investigation, three Asian males were arrested.  A total of 710 pounds of marijuana, more than 100 kilograms of cocaine, and more than 400 grams of MDMA were seized and Mr. Hoang was identified.

Based upon his voluntary confession, he admits that he was head of an organization based in Houston, Texas.  He was directly associated with several seizures in Houston, Texas, and in Racine County, Wisconsin.

From November of 2004 through February, 2006, Mr. Hoang conspired with a number of people in the United States, Canada, and Mexico to distribute cocaine, marijuana, and Ecstasy and to collect drug debts for others, higher level distributors. During that two-year period, his drug trafficking netted him approximately $500,000.

The Defendant was known as a Houston-based distributor who regularly obtained hydroponic marijuana from "Big Brother," a supplier operating out of Toronto, Canada, who used semi-tractor trailers to ship 200- to 250- pound quantities of marijuana to Mr. Hoang in Houston every two or three weeks.

"Big Brother" fronted the marijuana to Mr. Hoang and charged him approximately $2,500 per pound.  During this same period Mr. Hoang was obtaining marijuana from BB, he was also obtaining cocaine from a Mexican supplier.  Mr. Hoang obtained approximately 20 kilograms each month and supplied most of it to BB–or "Big Brother."

The agents made significant seizures as part of this investigation.  On November 22, 2005, law enforcement seized from one of Mr. Hoang's stash houses at 2828 Hayes, Number 418, in Houston, Texas, 26 kilograms of cocaine; 700 pounds of marijuana; and 400 grams of Ecstasy, approximately 1600 pills.

In a post-arrest statement, Mr. Hoang stated the Ecstasy was the remainder of a 60,000-pill shipment he had received from "Big Brother" on February 14, 2006–I'm sorry, I'm sorry–received from "Big Brother."

On February 14, 2006, agents seized 79.62 kilograms of cocaine, according to the lab report, from another of Mr. Hoang's stash houses located at 11712 Logan Ridge in Houston, Texas.  The agents noted that the used rolls of tape were identical to the tape used to wrap the kilograms of cocaine seized from 2828 Hayes, Number 418, on September 22, 2005.  Mr. Hoang had intended to ship all of that cocaine to "Big Brother" in Toronto.

The Defendant was assessed an aggravating role due to his involvement in employing others and directing in the distribution of cocaine to Canada.  Furthermore, at the time of his arrest on February 23, 2010, he was a passenger in a parked vehicle and was approached by a Houston police officer.

The officer subsequently located codeine on the driver and placed him under arrest. The officer ran a warrant check on Mr. Hoang and found him to have a marijuana warrant with the United States Marshal's Service out of Milwaukee, Wisconsin, and six city warrants with Houston, Texas.  He was placed under arrest and transported to jail.

I'm going to—and I hope this satisfies your recommendation, Ms. Herrera.  I think it will; but you know, we'll see.  You can say that wasn't your recommendation if it doesn't.

This–I'm –the term that I will impose upon Mr. Hoang shall run concurrently with his undischarged term of imprisonment imposed in Docket Number 07-CR-3041 out of the Eastern District of Wisconsin.  I'm going to adjust the sentence that I would have imposed by deducting ten months to account for the time that he spent in custody which will not, otherwise, be credited by the Bureau of Prisons toward the instant federal sentence pursuant to United States Sentencing Guideline, Section 5G1.3(b), Comment Number 2.

(Document No.54,  p. 21-24).  Judgment was entered on May 22, 2013.  (Document No. 50).  Hoang appealed his conviction to the Fifth United States Court of Appeals arguing that the Court erred in applying the § 3B1.1(b) enhancement based on his role in the offense and that he was punished twice for the same conduct.  The Fifth Circuit rejected all of Hoang's arguments.  The Court wrote:

We first consider Hoang's challenge to the district court's application of a three-level enhancement to reflect his role in the offense.  A three-level enhancement under U.S.S.G. § 3B1.1(b) "may be appropriate where 'a defendant did not organize, lead, manage, or supervise another participant, but . . . nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization.'" *United States v. St. Junius*, 739 F.3d 193, 208 (5th Cir. 2013)(quoting § 3B1.1, comment. (n.2)).

Hoang argues that there were no facts or evidence to support a finding that he played an aggravated role in the offense and that the district court's finding was improperly based upon the Government's mere suppositions.   The facts contained in the presentence report (PSR) are presumptively reliable, *see United States v. Franklin*, 148 F.3d 451, 460 (5th Cir. 1998), and because those facts are not rebutted by Hoang, the district court was entitled to rely upon them in determining whether the enhancement was warranted.  *See United States v. Rose*, 449 F.3d 627, 633 (5th Cir. 2006).  Considering only the February 2006 search of a stash house rented by Hoang, the PSR reflects the following . Hoang controlled the assets of the criminal activity such that he was able to access the cash needed to buy cocaine in large quantities from his Mexican source.  He was also able to use those assets to rent a stash house,

and he had responsibility for that property as it was rented in his own name.  Hoang acted in a supervisory capacity Phong Tran, leaving large amounts of cocaine with him for repackaging and taking responsibility for hiring a defense attorney for Tran when he was arrested in connection with this conspiracy.  Under the facts, it is at least plausible that Hoang's conduct warranted the § 3B1.1(b) enhancement, and the district court thus did not clearly err in applying the enhancement.  *See* § 3B1.1, comment. (n.2); *St. Junius*, 739 F.3d at 208-09; *United States v. Brown*, 727 F.3d 329, 340 (5th Cir. 2013).

Additionally, Hoang argues that the district court erred in applying the § 3B1.1(b) enhancement because another judge had already decided that no such enhancement was warranted.  Hoang was convicted in the Eastern District of Wisconsin for conspiracy to possess with th intent to distribute marijuana, and the facts of the instant case were before the sentencing judge in Hoang's Wisconsin case.  Hoang argued in his earlier case that he was a minor participant in the marijuana-distribution conspiracy, an argument that the district court in that case rejected.  Because neither the probation officer nor the Government had suggested a § 3B1.1(b) role enhancement in Hoang's prior case, however, the sentencing judge in that case did not make any determination as to whether such an enhancement was warranted.  Accordingly, Hoang's arguments that the judge in the Wisconsin case found him to be an average participant and that the district court's determination that the enhancement was warranted in this case is "in direct conflict with the finding of" another federal district court lack a factual basis.

We turn next to Hoang's argument that, because the district court sentenced him to 225 months of imprisonment in this case and he was sentenced to only 102 months of imprisonment in his Wisconsin case, he is being punished twice for the same conduct and offense.  The Double Jeopardy Clause prevents the Government from engaging in successive punishments for the same offense.  *See Witte v. United States*, 515 U.S. 389, 396 (1995).  However, the "use of evidence of related criminal conduct to enhance a defendant's sentence for a separate crime within the authorized statutory limits does not constitute punishment for that conduct within the meaning of the Double Jeopardy Clause."  *Witte*, 515 U.S. at 399.

Hoang attempts to distinguish *Witte* on the ground that the Government included in the factual basis for Hoang's marijuana-distribution-conspiracy conviction facts that gave rise to the instant cocaine-distribution-conspiracy conviction.  He maintains that, by doing so, the Government made the cocaine-distribution-conspiracy conduct the "primary conduct" to which Hoang pleaded guilty in the Wisconsin case.  Hoang's earlier conviction was for conspiring between November 2003 and September 2005 to possess with the intent to distribute marijuana.  His instant conviction is for conspiracy in February 2006 to possess with the intent to distribute cocaine.  Hoang had pointed to no legal authority for the proposition that the inclusion of facts describing his conduct in 2006 in the factual basis for his earlier conviction could have the effect of transforming a guilty plea to a marijuana-

distribution-conspiracy into a plea for the 2006 cocaine-distribution conspiracy. Hoang was not punished twice for the same offense or conduct. *See Witte,* 515 U.S. at 399. (Document No. 68).

Because Hoang did not file a petition for certiorari, his judgment of conviction became final on or about October 13, 2014. Hoang had one year to file a § 2255 motion or until October 13, 2015. On or about August 15, 2014, Hoang timely filed the instant § 2255 motion (Document No. 74), and Memorandum in Support (Document No. 75). Hoang argues that he was denied his constitutional right to effective assistance of counsel. The Government has answered and has moved for summary judgment. (Document No. 81). The Government maintains that Hoang has not and cannot show he was prejudiced by the alleged deficiencies. The Government has requested that the Court take judicial notice of the written plea agreement, plea hearing transcript and sentencing transcript in the Eastern District of Wisconsin, Case No. 07-CR-304. The Government's request is granted and aret attached hereto as Exhibit A-D.

## II.  Discussion

A.  Ineffective Assistance of Counsel claims

Claims of ineffective assistance of counsel are generally measured by the standard of *Strickland v. Washington,* 466 U.S. 668 (1984). Under *Strickland,* a petitioner must be able to show that his counsel was deficient and that the deficiency prejudiced him to the extent that a fair trial could not be had. *Strickland,* 466 U.S. at 687. Deficiency is judged by an objective reasonableness standard, with great deference given to counsel and a presumption that the disputed conduct is reasonable. *Id.* at 687-88. The prejudice element requires a petitioner to prove that absent the disputed conduct of counsel, the outcome would have been both different and more favorable. *Id.* at 694-95. Under *Strickland,* a petitioner must establish both deficiency and prejudice prongs to be entitled to habeas relief. The failure to establish either deficient performance or prejudice makes it

unnecessary to examine the other prong. *United States v. Seyfert,* 67 F.3d 544, 547 (5th Cir. 1995).

Under the deficiency prong of *Strickland*, judicial scrutiny of counsel's performance is "highly deferential" and "a strong presumption" is made that "trial counsel rendered adequate assistance and that the challenged conduct was the product of reasoned trial strategy." *Wilkerson v. Collins*, 950 F.2d 1054, 1064-65 (5th Cir. 1992), *cert. denied,* 509 U.S. 921 (1993) (citing *Strickland*). To overcome the presumption of competence, the petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Under the prejudice prong of *Strickland,* a petitioner must be able to establish that absent his counsel's deficient performance, the result of his trial could have been different. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691. When ineffectiveness claims relate to counsel's performance at sentencing, as raised herein, *Strickland's* deficiency prong is met when counsel fails to "research facts and law and raise meritorious arguments based on controlling precedent. *United States v. Fields*, 565 F.3d 290, 296 (5th Cir.), *cert. denied*, 558 U.S. 914 (2009)(citing *United States v. Conley*, 349 F.3d 837, 841 (5th Cir. 2003)). In addition, "'any amount of [additional] jail time has Sixth Amendment significance.'" *Lafler v. Cooper*, ___U.S.___, 132 S.Ct. 1376, 1386 (2012)(quoting *United States v. Glover*, 531 U.S. 198, 203 (2001)). Counsel is not required to "anticipate changes in law or raise meritless objections." *Fields*, 565 F.3d at 296.

Constitutionally effective assistance of counsel under *Strickland* is not errorless counsel. The determination of whether counsel has rendered reasonably effective assistance turns on the totality of facts in the entire record. Each case is judged in light of the number, nature, and seriousness of the charges against a defendant, the strength of the case against him, and the strength and complexity

of his possible defense. *Baldwin v. Maggio*, 704 F.2d 1325, 1329 (5th Cir. 1983), *cert. denied,* 467

U.S. 1220 (1984).  The reasonableness of the challenged conduct is determined by viewing the

circumstances at the time of that conduct.  *Strickland,* 466 U.S. at 690.  "We will not find inadequate

representation merely because, with the benefit of hindsight, we disagree with counsel's strategic

choices." *Kitchens v. Johnson*, 190 F.3d 698, 701 (5th Cir. 1999) (quoting *Green v. Johnson*, 116

F.3d 1115, 1122 (5th Cir. 1997)).  Conclusory allegations of ineffective assistance of counsel do not

raise a constitutional question in a federal habeas petition. *Miller v. Johnson,* 200 F.3d 274, 281 (5th

Cir), *cert. denied*, 531 U.S. 849 (2000) (citing *Barnard v. Collins,* 958 F.2d 634, 642 (5th Cir. 1992);

*Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983)).

The United States Supreme Court in *Harrington v.  Richter*, 562 U.S. 86, 131 S.Ct.  770, 778

(2011) discussed *Strickland* in the context of a habeas proceeding involving a state conviction.

While *Harrington* did not involve a federal habeas proceeding involving a federal conviction, the

Court's discussion of *Strickland* and ineffective assistance of counsel claims is instructive and

equally applies to claims brought in a federal habeas proceeding such as those raised herein.

With respect to ineffective assistance of counsel claims, the Court observed that "[t]here are,

[ ] 'countless ways to provide effective assistance in any given case.  Even the best criminal defense

attorneys would not defend a particular client in the same way.'  Rare are the situations in which the

'wide latitude counsel must have in making tactical decisions' will be limited to any one technique

or approach." *Id.*  at 788-89 (quoting from *Strickland*, 466 U.S. at 689).  As a result, counsel's

performance does not fall below that guaranteed by the Sixth Amendment where it can be shown that

counsel formulated a strategy that was reasonable at the time and balanced limited resources with

effective trial tactics and strategies. *Harrington*, 131 S.Ct.  at 789.  "Just as there is no expectation

that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for

a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities." *Harrington*, 131 S.Ct. at 791. Moreover, "it is difficult to establish ineffective assistance when counsel's *overall* performance indicates active and capable advocacy." *Harrington*, 131 S.Ct. at 791 (emphasis added). Finally, in considering the prejudice prong of *Strickland*, the likelihood of a different result must be substantial, not just conceivable. *Id.* at 791-792 (Citations omitted). As a result, "'[s]urmounting *Strickland's* high bar is never an easy task.'" (quoting from *Padilla v. Kentucky*, 559 U.S. 356, 371(2010)). In part, because:

> Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom.

*Harrington*, 131 S.Ct. at 778 (citations omitted).

Hoang claims that his trial counsel was ineffective for failing to move for dismissal of the indictment based on alleged violations of Hoang's statutory right to a speedy trial and constitutional right to a speedy trial. Hoang argues that his attorney could have moved to dismiss the indictment based on the lapse in time from the date he was indicted in the Southern District of Texas, Houston Division, on or about March 31, 2010, until he made his initial appearance on March 2, 2012, was arraigned on March 6, 2012, and entered his guilty plea on September 7, 2012. According to Hoang, counsel failed to understand or even know "the rules of the game" and that because of counsel's failure to move for dismissal of the indictment, he was sentenced to 225 months imprisonment. (Document No. 75, p. 14). The Government counters that counsel's decision not to move for dismissal of the indictment based on alleged violations of the right to speedy trial was reasonable under the circumstances.

The Speedy Trial Act provides, in pertinent part, that a trial must commence within seventy days of the defendant's initial appearance or the filing of an indictment, whichever is later. 18 U.S.C.§ 3161(c)(1). The Act further provides that certain events pause the seventy-day clock. *see* 18 U.S.C. § 3161(h). Events which pause the seventy-day clock include delays resulting from a continuance granted at the request of the defendant. *Id.* at 3161(h)(7)(A). With respect to his statutory right to a speedy trial, the speedy-trial clock began to run from his first appearance in the Southern District on March 2, 2012, and not when the indictment was filed on March 31, 2010, since that was the later date. Moreover, the filing of the motions to continue are events which pause the seventy-day clock. There was no basis for counsel to move to dismiss the indictment based on the a violation of the Speedy Trial Act.

The Sixth Amendment guarantees defendants in all criminal prosecutions "the right to a speedy and public trial." U.S. Const. amend. VI. The right attaches when a defendant is arrested or indicted on federal charges, whichever comes first. "The right of a speedy trial is necessarily relative," and cannot "be quantified into a specified number of days or months." *Barker v. Wingo*, 407 U.S. 514, 522-23 (1972)(internal quotation marks omitted). Factors the Court weighs in determining whether the right to a speedy trial has been violated are: (i) the length of the delay, (ii) the reason for the delay, (iii) whether the defendant asserted his right to a speedy trial, and (iv) whether the delay prejudiced the defendant. *Id.* at 530. The factors are related and must be considered together along with other relevant circumstances. *Barker*, 407 U.S. at 533.

Here, as for the length of the delay, it is undisputed that Hoang was indicted by a federal grand jury in the Southern District of Texas on March 31, 2010. He made his initial appearance on March 2, 2012, and was arraigned on March 6, 2012. Trial was set for May 7, 2012. On March 20, 2012, a motion to substitute counsel and for continuance was granted. Trial was re-set to June 8,

2012.  A second unopposed motion to continue was filed by counsel on June 6, 2012.  The request

was granted and trial was re-set to September 7, 2012.  He pled guilty on September 7, 2012.  Here,

the delay of two years would have weighed in favor of Hoang had counsel raised a speedy-trial

challenge.  The reason for the delay is the next factor considered.  The government explains that the

delay was due entirely to the fact that Hoang was being prosecuted on federal marijuana conspiracy

charges in the Eastern District of Wisconsin, and that he was brought to Houston as soon as the

Wisconsin prosecution was completed.   Hoang was charged by Indictment in the Eastern District

of Wisconsin, Milwaukee Division on November 27, 2007.  His arraignment was set for December

14, 2007.  He failed to appear and a warrant was issued for his arrest.  On February 22, 2010, Hoang

was arrested in Houston, Texas during a routine traffic stop.   A records check revealed the

outstanding federal arrest warrant.  Because of the pending federal charges, Hoang appeared before

a United States Magistrate Judge in the Southern District of Texas, Houston Division pursuant to

Rule 5 of the Federal Rule of Criminal Procedure and was ordered removed to the Eastern District

of Wisconsin.  The docket sheet from the Wisconsin case shows that he was arraigned on March 11,

2010, pleaded guilty on June 3, 2010, and was sentenced on February 3, 2011.  He was remanded

to the Bureau of Prisons to serve the 102 month sentence imposed by the Wisconsin Court. It was

at this juncture, that arrangements were made to bring him to the Southern District of Texas,

Houston Division. Hoang made his initial appearance in the Southern District of Texas, Houston

Division on or about March 2, 2012. In addition, the record shows that Hoang was aware that he had

been indicted in the Southern District of Texas and that a writ had been filed. Nothing in the record

suggests that the government delayed trial to gain an unfair advantage at trial. Here, concurrent

prosecution in two federal jurisdictions would have been logistically difficult and could have resulted

in speedy trial delays in both jurisdictions.  The reason for the delay would have likely weighed in

favor of the Government had counsel raised a speedy-trial challenge. *See United States v. Ellis*, 622 F.3d 784, 791 (7th Cir. 2010)("It is generally accepted that a delay occasioned by the prosecution of the defendant in another jurisdiction is not a basis for a dismissal on constitutional speedy-trial grounds."). The third factor is whether Hoang asserted his speedy-trial right. It is undisputed that he did not. This factor would have weighed in favor of the government had counsel raised a speedy-trial challenge. The last factor is whether the defendant can show that the delay in prosecution prejudiced him. Here, a delay of two years does not rise to the level of extreme prejudice. Further, Hoang has not make a particularized showing of actual prejudice. In *Barker*, the Supreme Court identified three interests the speedy trial right is intended to promote: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Barker*, 407 U.S. at 532. The Supreme Court identified the third factor as the interest given the most weight because it implicates "the fairness of the entire system." *Id.* Here, Hoang has made no specific allegations of actual prejudice caused by the delay. This factor would not have weighed in Hoang's favor had his counsel raised a speedy-trial challenge.

"Counsel's conscious and informed decision on trial tactics and strategy is not a permissible basis for a claim of ineffective assistance of counsel unless the chosen strategy was so poor that it robbed the defendant of any opportunity to get a fair trial." *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997). Upon this record, Hoang cannot and has not shown that he was prejudiced by counsel's failure to move to dismiss the indictment based on a violation of his statutory right to a speedy trial or constitutional right to a speedy trial. This ineffectiveness claim fails.

Hoang next alleges that his counsel was ineffective for failing to advocate strategic defense strategies during the plea negotiation stage of the proceedings. According to Hoang, counsel failed

to secure a favorable plea agreement that might have limited his sentencing exposure.  Hoang claims that between the six months between his initial appearance and guilty plea, that counsel could have and should have provided him with "available strategic options ... to consider before pleading guilty."  (Document No. 75, p. 16).

The law is clear that there is no constitutional right to a plea bargain.  *Weatherford v. Bursey,* 429 U.S. 545, 561 (1977)("[T]here is no constitutional right to plea bargain; the prosecutor need not do so if he prefers to go to trial."(alterations added); *United States v. Rankin,* 572 F.2d 503, 505 (5th Cir. 1978)("[T]here is no constitutional right to plea bargain. . .").  Hoang does not allege that the Government offered a written plea agreement.  He has presented no evidence that the Government would have offered him a plea agreement stipulating to a sentence below the Sentencing Guidelines if his attorney had initiated negotiations or that the Court, in its discretion, would have accepted a sentence below the Sentencing Guidelines even if the parties had stipulated to one.  Hoang has done little more than speculate about potential sentencing benefits he was denied.  That said, by pleading guilty to the one count Indictment, he benefitted from a 3-level downward adjustment of his total offense level under U.S.S.G. 3E1.1 for acceptance of responsibility.  He never states that he would have insisted on going to trial if his attorney had not advised him to plead guilty.  Moreover, the holdings of  *Missouri v. Frye,* ___U.S. ___, 132 S.Ct. 1399 (2012) and *Lafler v. Cooper,* ___U.S.___, 132 S.Ct. 1376 (2012) that he relies on in support of his ineffectiveness argument do not apply.  The cases apply when the Government has extended a formal plea offer.  In *Lafler,* the Supreme Court held that if the Government offers the defendant a plea bargain, the defendant is entitled to effective assistance of counsel in deciding whether to accept it, and if that right is denied, the defendant can show prejudice if the loss of the plea opportunity led to a trial that resulted in a conviction on more serious charges or the imposition of a more severe sentence.  Id at 1387.  The

Court wrote: "[i]f no plea offer made, or a plea deal is accepted by the defendant but rejected by the judge, the issue raised here simply does not arise." Id at 1387.  In *Frye*, the Supreme Court held that a defense attorney has a duty to communicate formal plea offers to the accused and that a defense attorney renders ineffective assistance of counsel when he allows the formal plea offer to expire without informing the defendant or allowing him to consider it.  132 S.Ct. at 1408.  Here, no plea offer was made and thus neither *Lafler* nor *Frye* applies.

Hoang also alleges that his counsel was ineffective for failing to advise him that as a permanent resident alien, whose family came to the United States at the end of the Vietnam War, that he would face deportation upon conviction stemming from a federal offense.  In *Padilla v. Kentucky*, 599 U.S. 356, 130 S.Ct. 1473, 1482 (2010), the Supreme Court held that counsel's failure to advise a client of the immigration consequences of a guilty plea is subject to the *Strickland* two-prong test. The Court held that the failure to warn a client as to whether a plea carries the risk of deportation violates, *per se*, the first prong under Strickland.  To be entitled to relief, the Court held that the movant must show prejudice, i.e. that there is a reasonably probability that Movant would have not pleaded guilty if informed of the adverse immigration consequences. *See id.* at 1482.  Accepting Hoang's allegations as true, counsel's failure to warn him of the adverse immigration consequences of his guilty plea constitutes deficient performance under *Strickland*.  The *Strickland* inquiry does not end here.  To be entitled to relief on an ineffectiveness of counsel claim, Hoang must show deficient performance *and* that he was prejudiced.  The Government argues that Hoang has not shown he was prejudiced within the meaning of *Strickland* and therefore is not entitled to relief.

Here, Hoang has not met his burden to show prejudice within the meaning of *Strickland*. First, other than his conclusional allegation that counsel failed to discuss the immigration consequences of pleading guilty, he does not allege that he would have proceeded to trial had he

known of the likely immigration consequences of his plea. The evidence of guilt was strong. It is unlikely he would have proceeded to trial.  This factor weighs against a finding of prejudice since it is likely Hoang would have pleaded guilty even if advised of immigration consequences.   By pleading guilty, he received a three-point reduction for acceptance of responsibility.  In addition, Hoang had already  been convicted in another federal drug case and, as a result of that conviction, will likely be deported following imposition of that sentence. Finally, the record shows that the Court advised Hoang about possible deportation consequences of pleading guilty.

> The Court:  All right.  Are you a U.S. citizen?
>
> The Defendant:  Not yet.  No.
>
> The Court:  No?
>
> The Defendant:  No, Your Honor.
>
> The Court:  Okay.  Do you understand that a finding of guilt in this case will very likely result in your being deported from the United States?
>
> The Defendant:  I understand, Your Honor.

(Document No. 61, p. 4-5).  The law is clear that "[s]olemn declarations in open court carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977).  The admonishments by the Court and Hoang's sworn statement on the record that he understood the admonishments, weigh against finding prejudice under *Strickland*.  *See United States v. Kayode*, 777 F.3d 719 (5th Cir. 2014).  Based on the totality of the record, Hoang has not shown he was prejudiced by counsel's alleged failure to warn him of the likely deportation consequences and he is not entitled to relief on this claim.

Hoang alleges that counsel was ineffective for failing to seek to suppress the inculpatory statements that he made when he was arrested on October 30, 2006, at the Rainbow Bridge Port of

Entry in Niagara Falls, New York. Hoang had entered the United States from Canada using a fictitious Canadian passport.  Hoang claims that his "unconstitutionally elicited statements" should have been suppressed because he was not informed he was already indicted in Texas , when he spoke about Texas."  (Document No. 75, p. 23-24).  Hoang's ineffectiveness claim is undermined by the timing of the statements. When Hoang was interviewed in October 2006, he was not under indictment in Texas. He was indicted in March 2010.  Moreover, the record shows that Hoang was advised of his Miranda rights and acknowledged in writing that he understood those rights.  He does not allege that the waiver of his Miranda rights was the product of intimidation, coercion, or deception.  For a waiver to be valid, the decision to waive one's Miranda rights must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception."  *United States v. Cardenas*, 410 F.3d 287, 293 (5th Cir. 2005).  Counsel was not ineffective for failing to make a meritless objection.  This ineffectiveness claim fails.

Next, Hoang alleges that counsel was ineffective for failing to limit his sentencing exposure.  The record reflects that counsel filed written objections to the PSR.  The transcript of the sentencing hearing reveals that Hoang was questioned about the PSR and affirmatively stated that he had no objections that had not been raised by counsel.  Sworn statements in open court are presumed true. *United States v. Lampaziane*, 251 F.3d 519, 524 (5th Cir. 2001)("It is well established that '[s]olemn declarations in open court carry a strong presumption of verity.'")(quoting *Blackledge v. Allison,* 431 U.S. 63, 74 (1977)). To the extent that Hoang suggests that that the objections were not adequate because the Court overruled them is wholly conclusory.  The fact that the objections were overruled and failed to change the outcome does not mean that his attorney's performance was deficient. *Youngblood v. Maggio*, 696 F.2d 407, 410 (5th Cir.), *cert. denied*, 461 U.S. 934 (1983). Hoang fails to assert any facts in support of his argument that counsel was ineffective for failing to limit his

sentencing exposure.   Conclusory allegations are insufficient to raise an issue of ineffective assistance of counsel.  *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir.), *cert. denied*, 531 U.S. 849 (2000)("[C]onclusory allegations of ineffective assistance of counsel do not raise an issue in a federal habeas proceeding.").  This ineffectiveness claim fails.

Hoang also claims that counsel was ineffective for failing to file a sentencing memorandum. According to Hoang, counsel could have and should have urged consideration of the § 3553(a) factors and U.S.S.G. § 5G1.3(b).

Section 5G1.3(b) provides:

If subsection (a) does not apply, and a term of imprisonment resulted from another offense that is relevant conduct to the instant offense of conviction under the provisions of subsections (a)(1), (a)(2), or (a)(3) of § 1B1.3 (Relevant Conduct) and that was the basis for an increase in the offense level for the instant offense under Chapter Two (Offense Conduct) or Chapter Three (Adjustments), the sentence for the instant offense shall be imposed as follows:
(1) the court shall adjust the sentence for any period of imprisonment already served on the undischarged term of imprisonment if the court determines that such period of imprisonment will not be credited to the federal sentence by the Bureau of Prisons; and
(2) the sentence for the instant offense shall be imposed to run concurrently to the remainder of the undischarged term of imprisonment.

Again, the record undermines Hoang's claim.  The transcript of the Sentencing Hearing shows counsel's familiarity with the sentencing guidelines, including § 3553(a) when he argued for a variance under § 3553(a). (Document No. 54, p. 17-18).  In addition, the transcript of the Sentencing Hearing shows that U.S.S.G. § 5G1.3(b) was likewise addressed in the context of counsel's double jeopardy argument. (Document No. 54, p. 6-20).   Upon this record, Hoang has not shown counsel's performance at sentencing was objectively deficient, and no proof that such deficient performance prejudiced him in any way.  *See Strickland,* 466 U.S. at 687.

In conclusion, Hoang has offered no proof that deficient performance prejudiced him in any

way. *See Strickland,* 466 U.S. at 687.  Thus no relief is available under § 2255 on Hoang's ineffective assistance of counsel claims.

## III.  Conclusion and Recommendation

Based on the foregoing, it is

RECOMMENDED that the Government's Motion for Summary Judgment (Document No. 81) be GRANTED, and that Movant's § 2255 Motion (Document No. 74) be DENIED.

The Clerk shall file this instrument and provide a copy to all counsel and unrepresented parties of record.  Within 14 days after being served with a copy, any party may file written objections pursuant to 28 U.S.C. § 636(b)(1)(C), Fed.R.Civ.P. 72(b), and General Order 80-5, S.D. Texas.  Failure to file objections within such period shall bar an aggrieved party from attacking factual findings on appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Ware v. King*, 694 F.2d 89 (5th Cir. 1982), *cert. denied*, 461 U.S. 930 (1983); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982) (en banc).  Moreover, absent plain error, failure to file objections within the fourteen day period bars an aggrieved party from attacking conclusions of law on appeal. *Douglass v. United Services Automobile Association*, 79 F.3d 1415, 1429 (5th Cir. 1996).  The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208.

Signed at Houston, Texas, this 8th  day of April, 2016.

Frances H. Stacy
United States Magistrate Judge